UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MORRIS J. GREEN                                    CIVIL ACTION

VERSUS                                             NO. 13-5034

SHERIFF MARLIN N. GUSMAN ET AL.                    SECTION "R" (2)

## FINDINGS AND RECOMMENDATION

Plaintiff, Morris J. Green, is a convicted inmate currently incarcerated in the Elayn Hunt Correctional Center ("Hunt") in St. Gabriel, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983. The defendants are Orleans Parish Criminal Sheriff Marlin N. Gusman, Deputy Lester Burns,[1] the Orleans Parish Prison ("OPP") Medical Department and Deputy Jerry Thomas. Green alleges that, while he was incarcerated in OPP in January 2013, Deputy Burns used excessive force against him when he slammed Green's hand in a food tray slot door and that defendants failed to provide him with adequate medical care for his resulting injuries.

Trial/evidentiary hearing was conducted on February 18, 2014 before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.2(A). The court having made the evaluation required in Latiolais v. Whitley, 93 F.3d 205 (5th Cir. 1996), Record Doc. No. 27, plaintiff, appearing pro se, participated by

---

[1]Although the pleadings and much of the testimony refer to this defendant as "Burn," he testified that there is an "s" on the end of his last name, which is Burns.

video conference. 42 U.S.C § 1997e(f)(1). Tim Richardson and Charlin Fisher represented the defendants.

Based upon the following proposed findings of fact and conclusions of law, **IT IS RECOMMENDED** that plaintiff's claims be **DISMISSED WITH PREJUDICE** and judgment entered for defendants.

I.   EVIDENCE AT TRIAL

Plaintiff's inmate witnesses, Yoshio Jackson and Terrance Jynes, participated and testified by telephone. 42 U.S.C. § 1997e(f)(1). All other witnesses appeared in person. The following is a summary of the evidence offered at trial:

A.   Plaintiff's Case-in-Chief Witness Testimony

1.   Plaintiff's Testimony

Green testified that he is currently incarcerated at Hunt having been convicted in Orleans Parish of theft and parole violation on December 21 or 22, 2012. Green stated that he was sentenced to four years in prison. Plaintiff confirmed that his claims in this case are that on January 2 or 3, 2013, while incarcerated on "suicide watch" in the Templeman 5 facility at OPP, he was subjected to excessive force and thereafter received inadequate medical care for the injuries resulting from the incident.

As to his claim of excessive force, Green testified that the subject incident occurred on January 2 or 3, 2013, at about 3:45 - 4:15 a.m. He stated that before that day

he had submitted several grievance forms complaining that defendant, Sgt. Lester Burns, had subjected him to "threats, abuse and neglect," and that he had requested that he be "separated" from Burns.

Green testified that on the day of the incident, after seeing a psychiatrist at OPP for mental health care, Burns was returning him to his tier where eight other inmates were housed on "suicide watch." He said that, after placing Green in the cell while he was still handcuffed, Burns directed Green to put his hands into a small "food trap" door built into the larger cell door itself, so Burns could then remove the handcuffs. Green described the food tray slot as having a metal edge with an iron door that opens and closes so that guards outside the cell area can slide food trays into the inmates at meal times. Exhibit F is a photograph of the subject food tray slot and its door.

Green stated that he and Burns then "got into a conflict," when another one of the inmates on the tier was trying to talk to Burns.  He alleged that Burns became mad, cursed the inmate and said he did not want to deal with him.  Green said Burns ordered him to get away from the bars, but his hand was still in the food tray slot with its door open, when Burns called Green a derogatory name and slammed the food tray slot door down on Green's hand, saying "I don't like you."

Green said he was "hollering" and "blood was gushing out of my hand."  He testified that another officer, Deputy Thomas, was also on the tier at the time of the

incident, but both Burns and Thomas left the tier, which he alleged was a security protocol violation because an officer was supposed to be on duty on the suicide watch tier at all times.  Green said the injury was to the ring finger of his <u>right</u> hand, "it was cut down the middle," and that blood was "everywhere." He said it took Burns and Thomas about 15 to 20 minutes to return to the cell with Nurse Robert Gates to look at his finger.

Green testified that during that 15 to 20 minutes, other inmates tried to help him pull his hand from the slot because it remained stuck in the small door. "It was turning blue," he said, and it took him about ten minutes to pull it out. Green said Nurse Gates arrived about five minutes later and that he provided Green with a "Band-Aid" and Motrin, which Green claimed he could not take because he is allergic to Motrin.

Plaintiff testified that Deputy Thomas knew that Green and Burns had previously been "bickering back and forth" and that Thomas wanted to help him, but Burns told him not to.  Green denied that he or other inmates had put soap into the food tray slot door locking mechanism, as the deputies alleged, explaining that inmates on suicide watch were not allowed to have soap.  He said it was "unnecessary" for Burns to slam his hand in the slot door.

As to his medical care claim, Green complained that after some initial treatment, Nurse Gates "never did any follow-up," failed to take an x-ray or otherwise make sure his hand was not damaged, and never gave him any medication, except Motrin, which

he could not take because of his allergy.  He testified that no one at OPP ever sent him to have his hand examined by a doctor, which did not occur until he was transferred to Hunt on January 7, 2013, five days after the incident.  He said his finger was numb and swollen and the skin on his finger was "busted up in the middle," but he did not suffer any broken bone.

Green stated that upon his arrival at Hunt, he was told that it was "too late" to stitch the laceration on his finger.  At Hunt, he said, the condition of his finger was monitored, and it was wrapped in a bandage and treated with ointment daily.  He said the cut healed in four or five days, and a subsequent x-ray at Hunt showed no break.

On cross-examination, Green confirmed that he was being held in a "suicide watch" cell on the day of the incident. He said that after he was returned from his medical appointment that morning, he was placed into the cell with his handcuffs still on and ordered to put both hands through the food tray slot door so the handcuffs could be removed. He said that one cuff was removed, but he and Burns became involved in a "confrontation," and before he could remove his other hand from the slot, while the handcuffs were still on, Burns slammed the door onto his hand.  He again denied that he or any other inmate had blocked the food tray slot door open by shoving soap into its locking mechanism and that Burns had to use a key to remove the soap from the lock.

Green reiterated several times in response to defense counsel's questioning that it was his <u>right</u> ring finger that was injured in the incident.  He said that it was only that one finger that remained in the door when it was slammed. When told by defense counsel that his medical records, including those from Hunt, indicated that it was his <u>left</u> ring finger that was injured, not his right, Green initially insisted that his "paperwork" said it was his right finger, then reviewed it and first said the paperwork did not indicate whether it was the left or right, before finding a reference to his injured left finger, which he said was <u>in</u>correct.  He then testified that his right finger has a knot on it, not his left finger, and that he does not know his left from his right. Asked separately by defense counsel and the court to raise whatever hand was injured in the incident, Green raised his right hand.

Green acknowledged a Hunt medical record indicating that by January 18, 2013, at 9:30 a.m. his "fourth finger laceration to [his] left hand [was] completely healed." He said that only the ring finger on his right hand had been caught in the food slot door in the incident.

In summary, Green alleged that Burns's action in slamming his hand in the food tray slot door was "retaliation" for having filed grievances against Burns and asking to be separated from Burns after their previous arguments.

2.      Testimony of Yoshio Jackson

Yoshio Jackson testified that he is currently incarcerated at the Allen Correctional facility, in Kinder, Louisiana, having been convicted of armed robbery on June 7, 2013, for which he was sentenced to ten years in prison.  Jackson testified that he was in OPP on January 2-3, 2013, in the same cell with plaintiff, but he could not recall if it was in the Templeman 5 unit.

Jackson testified that Green did <u>not</u> have handcuffs on inside the cell at the time of the incident.  Jackson said he was located "on my rack" near the cell door when the incident occurred, but he could not recall exactly how it happened. "I just recall his hand got slammed in the door," he said, but he did not recall which hand or how long it remained caught in the door.

On cross-examination, Jackson confirmed that Green had his hands in the food tray slot, but he reiterated that Green was <u>not</u> in handcuffs at that time.

3.      Testimony of Terrance Jynes

Terrance Jynes testified that he is currently incarcerated at Dixon Correctional Institute in Jackson, Louisiana, because of a January 2013 conviction for being a previously convicted felon in possession of a firearm.  He testified that he is serving a 14-year prison sentence.

7

Jynes testified that on January 2-3, 2013, he was incarcerated in OPP in Templeman 5 and that he remembered that Sgt. Burns slammed Green's hand in the food tray slot door on that day. Jynes testified that Green and Burns were "fussin'" with each other, that Green had his hand in the slot and that Burns slammed the door on it. Jynes said he did not know if Burns had told Green to put his hand in the slot or how long Green's hand was caught in the slot.

Jynes testified that Green asked for medical assistance, but the deputies had left the tier to go into the hallway and would not get it for him. He said that Green's "middle finger or his long finger" was "bust open" and bleeding. Asked by the court which hand had been caught in the slot, Jynes said, "I think it was, let me see, left or right."

On cross-examination, Jynes stated that he was in his bed, about six or seven feet from the door, when the incident occurred. He said he had seen inmates put soap in the lock of the food tray slot door to keep it open "so we could breathe, it's hot in there." He said the guards do not usually "be trippin" about the food tray slot door being open.

Jynes was clear that Green was not wearing handcuffs either inside the cell or when Green put his hands in the food tray slot. Jynes said only one of Green's hands, including all of his fingers, were caught in the slot. He stated that Green's hand was "over the key thing" and when the slot door slammed, Green had to jerk his hand out of the slot.

Jynes testified that he saw Green get medical treatment, including a bandage and being taken to the nearby medical station. Asked again by defense counsel which of Green's hands was injured, Jynes rethought his prior evasion and said, "I really think it was his [Green's] right hand."

* * *

At the conclusion of the testimony of these witnesses, plaintiff's case-in-chief was held open for cross-examination by Green to include the testimony of the following persons, who were listed pre-trial as witnesses for <u>both</u> sides, Record Doc. Nos. 20 and 24, and whose direct examination was conducted by defense counsel.

B.    <u>Defendants' Case-in-Chief Witness Testimony</u>

1.    <u>Testimony of Sergeant Lester Burns</u>

Sgt. Burns testified that he has been a watch commander at the Templeman 5 facility of OPP for about eight years and that he was the assistant watch commander on the night shift in January 2013, when the incident with plaintiff occurred. He identified Exhibit A as the official OPP report dated January 3, 2013, that he prepared concerning the incident.

Burns said that on that date he was in Tier A-4, the "suicide direct observation" unit in Templeman 5. He said he had just escorted Green back to his cell after Green had been seen by Dr. Higgins, who was later identified as a psychiatrist. Burns said he

removed Green's handcuffs before placing him back in his cell and closing the cell door. Burns stated that he then noticed that there was soap plugging the locking mechanism of the food tray slot door, so he began to remove it by using a key to scrape the soap out of the hole.  Burns testified that it was then that Green put his hand through the food tray slot directly over the hole in the locking mechanism of its door in an attempt to prevent Burns from removing the soap, and that Burns scratched Green's hand with the key.

Burns explained that inmates often crammed soap into the locking mechanism to prevent the food tray slot door from locking so that they could keep it open. He said that security protocol provides that all hatches must remain closed on that tier, except when they are being used to deliver food trays, and that in the past plaintiff and other inmates had thrown urine and feces at the guards through that open door slot.

Burns clearly stated that he did not order Green to put his hands in the slot so that he could remove handcuffs because the cuffs had already been removed before Green was placed back into the cell. While Burns acknowledged that "sometimes" the guards have inmates put their hands into the slot to remove handcuffs, the general procedure is that, as a security measure, they do not put handcuffed inmates back into a cell with other inmates because a cuffed inmate would be "defenseless" against the other inmates and might be "jumped."

Burns then displayed for plaintiff and the court a photograph of the subject food tray slot door (Exhibit F) taken two days before the trial and said it was the same in the photograph as on the day of the incident. Burns said there was no way the heavy metal door could be closed on something trapped in the slot without breaking it because "it's like a pincer when it closes."

Burns said that he scratched Green's finger with the key he was using to try to scrape soap out of the slot door's locking mechanism, as Green tried to grab the key out of Burns's hand to prevent him from doing so.  Burns flatly denied slamming plaintiff's hand in the door and said he never intentionally tried to hurt Green.

On cross-examination, Burns said he did not see Green's injury at first.  He said that after he closed the food tray slot door, Green cried out that he was hurt, so Burns "came back and looked at it."  He said he saw a small cut on Green's finger that was bleeding.  He said he did not go immediately for help because no help appeared to be necessary.  "I am the help," he said.

As to closing the slot door, Burns said that he closed it after he had removed the soap from the locking mechanism.  He said Green's hand surely would have been broken if the door had been slammed forcibly on it because of the weight and "pincer" effect of the slot door.

Burns testified that he left the tier after plaintiff said he was injured to get the nurse and that as he left the tier Green was hysterically screaming, "he raped me, he raped me." Burns stated that the nurse's station was right next to the tier, that he was only away for 30 seconds to a minute, and that OPP Nurse Schible, who was then on duty, told Burns to bring Green to the nurse's station for treatment of Green's injury as soon as Green calmed down.

2.   <u>Testimony of Deputy Jerry Thomas</u>

Deputy Jerry Thomas testified that he has been a night watch deputy employed at OPP on the Templeman 5 suicide watch for more than eight years. He said that he was working there on the night of the subject incident, in direct observation and transporting of inmates who had either threatened suicide or who were in alcohol detoxification. He said Green was in that unit because he "claimed he would kill himself."

Thomas testified that he was taking another inmate to see the psychiatrist, like he does every morning, a hectic time of day in that unit, when he heard Green "hollering that his hand was caught." He said he did <u>not</u> see Green's hand in the food tray slot and he did <u>not</u> see Sgt. Burns try to injure Green intentionally or slam his hand in the door.

On cross-examination, Thomas testified that normally at that time of day the door of the food tray slot is left open so that the nurse can pass out medications to the inmates, and he thought that Sgt. Burns should not have tried to close the door at that time. He

acknowledged that the general OPP policy is that one of the deputies on watch must be in that area at all times, but it sometimes happens that both have to leave the tier, usually because Thomas is frequently away transporting inmates to see the doctor.

In response to Green's questioning, Thomas testified that Sgt. Burns "was headed your way to help you when you were hollering," but he did not know how long it took Burns to do so because Thomas was transporting another inmate to the doctor at that time.  He recalled that Burns and Green had several prior verbal confrontations on the tier and that Green had complained to Thomas about Burns, but he did not recall Green ever complaining that Burns had threatened to harm him.

On redirect examination by defense counsel, Thomas stated that soap is never supposed to be in the locking mechanism of the food tray slot door; that he has seen it there anyway at times; and that he himself had sometimes removed soap from the lock. He did not recall if any soap was in the food tray slot door locking mechanism on the day of Green's incident.

3.    Testimony of Nurse Robert Gates

Robert Gates testified that he has been employed as a licensed practical nurse at OPP for about 22 years. He said he is currently assigned to the Templeman 5 psychiatric unit in OPP and was there on the day of the subject incident. He said his general duties include attending to the inmates' medical and psychiatric needs, daily medication

delivery rounds, "patching up" inmates after altercations and "triage" of inmate sick call requests.

Gates testified that he saw Green during a "suicide watch check." Gates said the OPP medical records that he himself had recorded, Exhibit D, reflect that Green complained to Gates at that time that a door had shut on his finger and that another nurse had previously seen him, but nothing had been done, so Gates examined Green.  Gates said he observed a bandage on Green's <u>left</u> ring finger wrapped around "wound closure strips," which he described as tape-like instruments used by medical personnel to help a wound remain closed so that it will heal more quickly. Gates said that inmates would have no independent access to wound closure strips at OPP, so that someone from the medical department must have applied it to Green's wound. Gates said that he observed a half-inch laceration to the underside of Green's left ring finger with no swelling or bruises.

Gates said that he has examined many crushing or other traumatic injuries to hands and fingers while at OPP and that swelling and other deformities are always seen in such injuries, but none were apparent on Green's hand or finger. Gates said that because Green reported that he was having some pain, he called in a request to a doctor, who ordered Motrin for Green to be administered three times per day. Gates said Green's medical records contained no notation that Green was allergic to Motrin. He said that if he had

known Green was allergic to Motrin, he would have gotten him something else for his finger pain.  Gates said Green's medical records also indicated that Green was given an antibiotic ointment for his laceration.

On cross-examination, Gates testified that he did not know when the alleged door slamming incident had occurred and did not recall if Sgt. Burns had notified him of it. He said that any decision as to whether an injured inmate requires follow-up care depends on the severity of the injury and whether the inmate requests it. He described several opportunities inmates like Green on suicide watch at OPP have during the day to request medical care. Gates stated that when he examined Green's hand, he did not remove the wound closure strips because they must stay on the wound for several days to work at healing a laceration before they fall off on their own.

Gates said that "anything" could have caused a small laceration like Green's, but he did not know if it had been caused by a key. He acknowledged that no x-ray of Green's finger was taken at OPP.

C.    Exhibits

Exhibits A, B, C, D, E and F were received into evidence without objection. Exhibits A - E were the same records that plaintiff had requested pretrial for use as evidence in support of his case.

15

Exhibit A is the January 3, 2013, OPP incident report prepared by Sgt. Burns. It substantially corroborates Burns' testimony. Exhibit B is the Templeman 5, Tier A logbook for January 2-3, 2013, covering the time period relevant to the incident. It indicates, among other things, that soap was issued to inmates on one occasion and that Green asked twice to see the nurse about his finger. Exhibit C is the thick file of plaintiff's numerous OPP grievances concerning an assortment of complaints about a number of OPP deputies and medical personnel, including several that make allegations against Sgt. Burns, none of which are reflected in the grievances file as having been substantiated.

Exhibit D is plaintiff's medical records for the period of his incarceration in OPP. They were accurately summarized in the testimony of Nurse Gates, including the description and <u>left</u> ring finger location of the half-inch laceration with "no swelling," and its treatment with bandaging, wound closure strips, antibiotic ointment and Motrin on January 3, 2013.

Exhibit E is plaintiff's medical records for the period of his incarceration at Hunt after he was transferred from OPP. They indicate that the laceration was recleaned and dressed upon his January 8, 2013, arrival at Hunt, with "no infection or damage noted." An x-ray was taken on January 10, 2013, and it revealed "no fracture or discoloration."

A Hunt record dated January 18, 2013, notes: "Laceration of fourth finger, <u>left</u> hand. Completely healed.  No longer needs to be followed" (emphasis added).

Exhibit F is the photograph taken by Sgt. Burns two days before the trial of the food tray slot door involved in the subject incident.  The photograph depicts the tray slot, the metal door itself in the open position and its locking mechanism.

II.    <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

1.    Green was a convicted prisoner at the time of the January 2013 incident about which he complains.  The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"  <u>Wilkins v. Gaddy</u>, 130 S. Ct. 1175, 1176 (2010) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 4 (1992)).

2.    In <u>Wilkins</u>, the Supreme Court confirmed that the standards it had established in <u>Hudson</u> remain the law.

> The "core judicial inquiry," we held [in <u>Hudson</u>], was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 7, 112 S. Ct. 995; <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319-321, 106 S. Ct. 1078, 89 L. Ed.2d 251 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ."  <u>Hudson</u>, 503 U.S. at 9 . . . .
>
> . . . .  As we stated in <u>Hudson</u>, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  503 U.S. at 9, 112 S. Ct. 995.  "The Eighth Amendment's prohibition of 'cruel and unusual'

punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Ibid.</u> (some internal quotation marks omitted).  An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.  <u>Ibid.</u> (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)).

<u>Id.</u> at 1178.

3.     Under certain circumstances, an incident of the type described by Green might constitute an unconstitutional use of excessive force.  <u>See</u> <u>Fennell v. Quintela</u>, 393 F. App'x 150, 152, 155 (5th Cir. 2010) (Plaintiff alleged that prison officer ordered him "to place his arms through the shower stall's food tray slot so that she could remove his handcuffs. Officer Lopez-Lopez, however, did not simply remove Fennell's handcuffs; instead, she grabbed his wrists and twisted them."  "<u>If</u> <u>proven</u>, [plaintiff's] version of events . . . would allow a reasonable [factfinder] to find that [the officer] used excessive force in violation of the Constitution.") (emphasis added); <u>Watts v. Smart</u>, 328 F. App'x 291, 292, 293-94 (5th Cir. 2009) (prisoner's evidence that defendants struck him without provocation while he was in restraints "gives rise to genuine fact issues as to whether the force Sergeant Smith and Officer Meyer applied was excessive and whether their conduct was objectively reasonable."); <u>Morris v. Trevino</u>, 301 F. App'x 310, 313 (5th Cir. 2008) (Prisoner alleged that officer "twisted his arms into painful positions while his hands were handcuffed behind his back, yanked his hands through the tray slot opening of his

cell, beat and punched on his arms, and punched him in the face."  "[T]aking Morris's allegations as true, the force exerted by [defendant] was disproportionate to the amount of force necessary to maintain or restore order because the assault was, according to Morris, unprovoked.").   In this case, however, Green cannot be believed and has otherwise failed to prove facts such as those described in the foregoing decisions.

4.     Under the Eighth Amendment and Section 1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Hudson, 503 U.S. at 6; accord Petta, 143 F.3d at 901; Flowers v. Phelps, 956 F.2d 488, 491 (5th Cir. 1992).  Plaintiff need not show a significant injury to establish a constitutional violation; however, the extent of the injury may be considered in determining whether the force used was malicious, wanton or unnecessary.  Hudson, 503 U.S. at 7; Flowers, 956 F.2d at 491.  In addition, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 503 U.S. at 9-10).

5.     The law "require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury, . . . we do not permit a cause of action for every

contact between a citizen and a police officer.  In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation.  When the force used is insufficient to satisfy the legal standard necessary for recovery, the amount of force is de minimis for constitutional purposes."  Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted).  To determine whether injury caused by excessive force is more than de minimis for constitutional purposes, the context in which the force was used and all the surrounding circumstances must be examined.  Id.

6.      In finding the facts as to which the foregoing legal principles apply in this case, I find that Green has failed to establish an Eighth Amendment violation for the following reasons.  First and most importantly, I find that Green is not a credible witness and that his testimony cannot be credited.  Green's version of the incident – that Burns forcefully and intentionally slammed the food tray slot door down on his hand, causing serious injury – is wholly lacking in credibility.  Green's testimony was in conflict with his own witnesses, Jackson and Jynes, who themselves provided limited, sketchy testimony, the credibility of which itself was largely suspect.  In addition, Green, Jackson and Jynes are convicted criminals whose conviction may properly be considered in assessing their lack of credibility.  Fed. R. Evid. 609(a)(1).  This testimony was in conflict with the testimony of the other, credible witnesses and the documentary exhibits,

none of which support or corroborate the kind of injuries or other events involving the allegedly excessive force about which Green testified.  In short, plaintiff's story about the incident that led to the allegedly excessive force in this case was self-serving, uncorroborated by any other credible evidence and cannot be believed.

7.     Specifically, the version of events provided by Green and his witnesses was so replete with hyperbole, inconsistency and invention that it simply cannot be credited. First and foremost among the fallacies in plaintiff's story is his incredible insistence that it was his <u>right</u> ring finger that sustained the laceration, when the absolutely reliable medical records from both OPP and Hunt clearly and repeatedly state that it was his <u>left</u> ring finger that was cut, bandaged, treated, x-rayed and healed. Like Green himself, neither of his two inmate witnesses could accurately testify which hand was allegedly caught in the food tray slot door.  Jackson could not recall.  Jynes answered "left or right" when asked which of Green's hands was caught, thus covering all possible bases, before finally and erroneously guessing it was his right.  Jynes also testified that it was Green's "middle . . . or long finger" that was cut, rather than his ring finger.

8.     A second major fallacy in plaintiff's story is revealed by the extremely minor nature of the small laceration about which he complains. Having seen the photograph of the food tray slot door and heard the uncontroverted description of its weight, metal construction and "pincer" closing effect, it is impossible to believe that any

body part forcibly and intentionally slammed in that device would have merely suffered a minor cut instead of an observable traumatic injury. The absence of any swelling, bruising or discoloration reflected in the medical records undermines any veracity that might be assigned to Green's testimony.

9.      I also reject as falsehood Green's testimony that Burns left him handcuffed when he was returned to his cell and then ordered him to place his cuffed hands through the food tray slot door so that the cuffs could be removed.  Even Green's two inmate witnesses testified that Green was <u>not</u> wearing handcuffs inside the cell or when he placed his hands in the slot.  No other evidence corroborates Green's testimony in this regard.  On the contrary, Burns's testimony that handcuffs are routinely removed before inmates are returned to their cells for security reasons and that he removed Green's handcuffs before returning him to his cell on this occasion was entirely credible.

10.      Finally, Green's claim that he or other inmates could not have put soap in the slot door locking mechanism because they were not allowed to have soap on suicide watch was patently untrue.  His statement in this regard is rebutted by the clear entry in the relevant tier log, Exhibit B, that soap was in fact provided upon an inmate's request. In addition, in a moment of candor, Jynes admitted during his testimony that inmates often jammed soap into the food tray door slot locking mechanism to keep it open.

22

11.     For all of the foregoing reasons, Green's version of Burns's alleged use of excessive force against him has no credibility.

12.     On the other hand, Sgt. Burns, Deputy Thomas and Nurse Gates were entirely credible.  Their demeanor and manner of testifying were calm, detached, detailed and highly professional.  Viewed in the entirety of the circumstances, I am convinced that their account is credible.  Their testimony and the documentary evidence corroborate each other without substantial discrepancies.  Thus, I find the testimony of Sgt. Burns, Deputy Thomas and Nurse Gates credible and the testimony of plaintiff, Jackson and Jynes not credible.

13.     Based on the credible testimony of the witnesses and the other record evidence, I find that Burns used minimal, reasonable force during the incident when Green attempted to interfere with Burns's efforts to clean soap out of the locking mechanism of the food tray slot door.  Green was verbally hostile and actively resisted Burns' legitimate effort at security.  Indeed, Sgt. Burns exhibited creditable restraint in the face of Green's hostile, even bizarre, behavior.  Green's own aggressive and hostile behavior caused the physical contact with Sgt. Burns, which itself was almost accidental and caused only a minor injury.

14.     Under these circumstances, Sgt. Burns used only the force necessary to the circumstances.  Nothing about the minimal injuries for which Green was later treated

indicates that Burns used force that was excessive to its need.  Certainly, Burns did not maliciously, sadistically or intentionally smash Green's hand in the slot door.  The credible testimony makes clear that plaintiff was subjected to minor physical contact by Sgt. Burns, a response that Green himself initiated, and that the force used resulted in very minor injuries and was in no way malicious or sadistic.  In short, because the deputies' physical contact with Green was reasonable under the circumstances, plaintiff cannot establish the essential elements of his excessive force claim under Section 1983.

15.    For the reasons discussed above, no violation of a constitutional right occurred when Green's finger was injured because the deputies of the Orleans Parish sheriff acted under circumstances that justified the reasonable, particular physical contact that occurred.  Applying this standard, defendants' conduct must be judged objectively reasonable under these circumstances, and judgment must be entered in favor of defendants, dismissing plaintiff's claim of excessive force with prejudice.

16.    Green also claims that his medical care for the injuries suffered in the incident with Sgt. Burns was constitutionally inadequate.  In Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction

of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Hare, 74 F.3d at 650.

17.     "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 847 (1994). The Farmer definition applies to Eighth Amendment medical claims. Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

18.     An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show deliberate indifference to his "serious medical needs" to satisfy this prong.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993).

19.     Although the United States Court of Appeals for the Fifth Circuit has not defined "serious medical need," a majority of the other circuits have adopted the following definition.  "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention." Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (citing Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18  (1st Cir. 1995); Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987); Sheldon v. Pezley, 49 F.3d 1312, 1316 (8th Cir. 1995); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996); Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994)).  A medical condition is "serious" when "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on other grounds by WMX Tech., Inc. v. Miller, 104 F.3d 1133, 1135 (9th Cir. 1997).

20.    Second, plaintiff must establish that defendant possessed a culpable state of mind.  Farmer, 511 U.S. at 838 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one

of the components of the test is not met, it need not address the other component.  <u>Davis v. Scott</u>, 157 F.3d 1003, 1005 (5th Cir. 1998).

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 117 S.Ct. 1382, 1391 (1997) . . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

<u>Southard v. Texas Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference."  <u>Norton</u>, 122 F.3d at 291.

21.    The minor laceration that Green sustained in no way presented a serious medical need that posed a substantial risk of harm during his incarceration.  Plaintiff's exaggerated testimony concerning the extent of his injuries suffered during the incident was not credible and was not corroborated by the credible testimony of Nurse Gates or by the contemporaneous medical records.

22.    I find that the minor injuries suffered by Green during the altercation were de minimis and had no long-term effects.  <u>See</u> <u>Lockett v. Suardini</u>, 526 F.3d 866, 877 (6th Cir. 2008) ("minor lacerations and cuts" and soreness in two fingers, which were no longer obvious upon medical examination within 24 hours after altercation, were not serious medical needs); <u>Vaughn v. City of Lebanon</u>, 18 F. App'x 252, 274-75 (6th Cir.

2001) (no serious medical need when plaintiff's cuts, bruises and abrasions from struggle were visible but not permanent); Dawes v. Coughlin, 159 F.3d 1346, 1998 WL 513944, at *1 (2d Cir. 1998) (small laceration not a serious medical need); Davis v. Jones, 936 F.2d 971, 972-73 (7th Cir. 1991) (one-inch laceration not serious medical need); Benitez v. Locastro, No. 9:04-CV-423, 2010 WL 419999, at *7 (N.D.N.Y. Jan. 29, 2010) (bruises and a laceration not serious medical conditions); Willacy v. County of Brevard, No. 04-cv-1666-Orl-18DAB, 2007 WL 1017657, at *9 (M.D. Fla. Mar. 30, 2007) (inmate who alleged that he suffered numerous lacerations, contusions, bruising and burning sensation in his eyes after being attacked by another inmate, but did not seek further medical assistance after his wounds were cleaned, failed to assert a serious medical need).

23.    The credible testimony and medical records establish that plaintiff suffered only a minor cut with no visible signs of swelling, bruising or serious deformity and no long-term effects as a result of this incident. The small cut on his finger healed completely in no more than three (3) weeks.  His testimony about having serious, long-lasting injuries is not credible.

24.    In addition, the credible evidence negates any inference of deliberate indifference by defendants or any other jail officials.  The testimony of Nurse Gates, confirmed by the medical records, shows that Green received constitutionally adequate medical care on the day of the incident and thereafter.  Plaintiff was examined by two

nurses in response to his complaints and given antibiotic ointment, wound healing strips, bandaging and a prescription for Motrin.  In the reasonable exercise of his professional judgment, Nurse Gates found no indications that further treatment was needed.

25.    Under these circumstances, it cannot be inferred that jail personnel were deliberately indifferent in any way to plaintiff's condition. While it is clear from his allegations and testimony that Green was not satisfied with the extent or nature of his medical care, no finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>.  A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added).

26.    No such showing has been made on the current record.  The decisions made by the treating medical providers to render the care that they gave, rather than more specialized care, are classic examples of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

27.     Contentions like Green's that amount to a disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."  Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted); see id. (active treatment of prisoner's serious medical condition that ultimately resulted in death does not constitute deliberate indifference, even if treatment was negligently administered); Rowe v. Norris, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); see also Estelle, 429 U.S. at 107 (The "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice . . . ."); Corte v. Schaffer, 24 F.3d 237, 1994 WL 242793, at *1 (5th Cir. 1994) (Contrary to plaintiff's allegation that he had received "no treatment" because he believed he needed a referral to a specialist, he failed to demonstrate deliberate indifference when he was seen by prison medical personnel with results being within a normal range.); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician

and received x-rays and medication); <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993) (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); <u>Varnado v. Lynaugh</u>, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip."); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990) (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference).

28.     Green wholly failed to prove that his medical care for the minor laceration he suffered in the January 2013 incident violated his constitutional rights.  He failed to establish deliberate indifference to serious medical needs under the applicable constitutional standard.  His medical care claim must therefore be dismissed.

29.     Although Green named Sheriff Gusman as a defendant, no evidence was presented to establish that the sheriff was personally involved in any of the events upon which Green bases this lawsuit.  There are no allegations that the sheriff participated either in the subject incident itself or in Green's medical care.

30.     To hold Sheriff Gusman liable, plaintiff must establish either that he was "personally involved in the acts causing the deprivation of his constitutional rights or that

a causal connection exists between an act of [this defendant] . . . and the alleged constitutional violation." Douthit v. Jones, 641 F.2d 345, 346 (5th Cir. 1981); accord Cox, 281 F. App'x at 391 ; Kohler, 470 F.3d at 1115. "It is facially evident that this test cannot be met if there is no underlying constitutional violation." Rios v. City of Del Rio, 444 F.3d 417, 425-26 (5th Cir. 2006) (citing Breaux v. City of Garland, 205 F.3d 150, 161 (5th Cir. 2000)). In the instant action, plaintiff has failed to establish either that Sheriff Gusman was personally involved in any acts causing the deprivation of his constitutional rights or that a causal connection exists between an act of this defendant and the alleged constitutional violation.

31.     Green's claim against Sheriff Gusman is wholly derivative of his other claims against OPP medical care providers and deputies who dealt directly with Green. Under these circumstances, plaintiff states no cognizable Section 1983 cause of action against the sheriff, and all claims against the sheriff must be dismissed.

32.     In his complaint, Green named the OPP Medical Department as a defendant. However, a prison or jail or its administrative departments are not entities that can be sued under Section 1983 because they are not juridical entities under state law capable of being sued and/or because they are not "persons" for purposes of suit under Section 1983, as the statute and case law define that term. Cage v. Kent County Corr. Facility, 113 F.3d 1234, 1997 WL 225647, at *1 (6th Cir. 1997); Johnson v. LCDC Med. Staff,

No. 4:09-cv-13, 2009 WL 1256906, at *2 (E.D. Tenn. Apr. 29, 2009) (suit against

medical staff dismissed because "the Medical Staff is not a suable entity under § 1983");

Holifield v. Mobile County Sheriff's Dep't, No. 07-0321-CG-C, 2008 WL 2246961, at

*5 (S.D. Ala. May 29, 2008) (citations omitted) (suit dismissed because the prison

medical care unit "does not appear to be a distinct legal entity that is subject to suit");

Cullen v. DuPage County, No. 99C1296, 1999 WL 1212570, *1 (N.D. Ill. Dec. 14,

1999); Whitley v. Westchester County Corr. Facility Admin., No. 97CIV0420(SS), 1997

WL 659100, at *6 (S.D.N.Y. Oct. 22, 1997); Sponsler v. Berks County Prison, No. 95-

1136, 1995 WL 92370, at *1 (E.D. Pa. 1995); Powell v. Cook County Jail, 814 F. Supp.

757, 758 (N.D. Ill. 1993).  Thus, Green can assert no claim against the OPP Medical

Department under Section 1983.

33.    As a general matter, "costs – other than attorney's fees – should be allowed

to the prevailing party." Fed. R. Civ. P. 54(d)(1). Defendants are the prevailing parties

in this case.

*  *  *  *  *

To whatever extent, if any, that the foregoing findings of fact constitute

conclusions of law, or vice versa, they are adopted as such.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's claims against all defendants be **DISMISSED WITH PREJUDICE** and that judgment be entered against plaintiff and in favor of defendants, plaintiff to bear all costs.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

New Orleans, Louisiana, this _____10th_____ day of March, 2014.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

34